# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT JACKSON

_____

| | | |
|---|---|---|
| **CHARLES S. RIGGAN,** | ) | |
| | ) | |
| Plaintiff/Appellee, | ) | Shelby Chancery No. 102307 |
| | ) | |
| **vs.** | ) | |
| | ) | Appeal No. 02A01-9511-CH-00246 |
| | ) | |
| **WILLIAM TURNER ASKEW,** | ) | |
| | ) | |
| Defendant/Appellant. | ) | |

**FILED**

**October 29, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

## APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
### AT MEMPHIS, TENNESSEE

### THE HONORABLE NEAL SMALL, CHANCELLOR

For the Plaintiff/Appellee:

Stephen G. Beem
William P. Efird
Memphis, Tennessee

For the Defendant/Appellant:

Tim Edwards
James F. Horner
Memphis, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCUR:

ALAN E. HIGHERS, J.

DAVID R. FARMER, J.

**OPINION**

This case arises out of the dissolution of a partnership. The plaintiff alleged that he contributed substantially more than the defendant to the partnership's capitalization, and sought an award of damages for the amount of his excess contribution plus interest. The trial court held in favor of the plaintiff, and we affirm.

In 1974, Plaintiff/Appellee Charles S. Riggan ("Riggan") approached Defendant/Appellant William Turner Askew ("Askew") with a proposition to acquire over 200 acres of real estate in northern Mississippi for development as industrial property. The parties formed a partnership, A&R Associates (hereafter "the partnership") in order to purchase and develop that land. There was no written partnership agreement. It was both parties' understanding that Riggan would serve as the primary financial contributor and Askew would provide expertise and contacts in the real estate industry to market the property to potential buyers.

In 1976, the parties purchased the property (the "Mills property") for $585,502.25. The sale was owner-financed. Both Riggan and Askew signed a promissory note (the "Mills note") in the amount of $446,627.00 to the Mills family. The Mills family took a first mortgage on the property as collateral for the loan. The promissory note provided for repayment of the note in ten annual installments. The Mills property was the partnership's sole asset.

The parties were unable to sell the Mills property *in toto*. Eventually, the partnership sold several small parcels. The proceeds of these sales were used to amortize the debt on the remaining property. In 1979, the partners borrowed $120,000 from Askew's mother in order to meet the debt payments on the Mills note. She was granted a second mortgage on the Mills property to secure the debt (hereafter the "Hood note"). The Mills note was finally paid in full in 1985. The record indicates that, over the life of the partnership, both partners periodically provided cash infusions to service the partnership debt. It is undisputed that Riggan provided approximately $638,000 while Askew contributed $72,000.

The partners pledged their interest in the Mills property to secure several personal loans that Riggan received, totaling $1,200,000. The proceeds from the loans were used in some of Riggan's business ventures outside of the partnership. Askew expressly limited his liability on these loans to his interest in the partnership property.

In 1989, Riggan filed for bankruptcy. Consequently, in March 1989, the A&R partnership was dissolved. Thereafter, in November 1989, the parties agreed to sell the remainder of the Mills property for $685,927.17. The proceeds from the sale were used to pay off the Hood note. In addition, $402,000 of the proceeds were used to repay funds contributed by Riggan.

Subsequently, partnership tax returns were prepared and filed. The debt due the partners was closed out based on their respective contributions, producing a $75,000 capital loss to Riggan and a $75,000 capital gain to Askew. The tax returns indicated that, in effect, Riggan had advanced the partnership $150,000 more than Askew. The partnership tax returns also indicated that the partnership's losses were divided equally each year.

The parties unsuccessfully attempted to resolve their differences. Riggan then filed the present lawsuit in 1992, seeking an accounting. Askew's answer raised several affirmative defenses, asserting in part that Riggan did not have standing to bring the lawsuit because of his personal bankruptcy filing in 1989. Askew filed a motion to dismiss on grounds that Riggan's bankruptcy trustee was the only party with legal standing to request an accounting. Thereafter, Riggan purchased the rights to the cause of action from the bankruptcy trustee for $15,000. Consequently, the parties entered a Consent Order withdrawing Askew's motion to dismiss. Askew then filed a counter-complaint alleging that Riggan breached his fiduciary duty to the partnership.

At the bench trial in this cause, Riggan contended that the oral partnership contract included an agreement to share the partnership's profits and losses equally. Askew argued that, at the time Askew agreed to become partners with Riggan, he believed that he would not be liable for monetary losses -- his contribution would be his work in selling the property and Riggan would supply the money. Askew cited Riggan's use of the Mills property as collateral for outside business ventures as evidence that the partnership agreement had changed to limit Askew's liability to his interest in the partnership property.

Askew's certified public accountant, James Hynds, testified on Askew's behalf at the trial. Hynds had prepared the partnership's tax return. He testified that he rectified the partnership account by closing out the debt due the partners based on their respective contributions, with a $75,000 capital loss to Riggan and a $75,000 capital gain to Askew. Hynds acknowledged that the tax returns indicated that, in effect, Riggan had advanced the partnership $150,000 more than Askew,

2

and that Askew would have to pay Riggan $75,000 to compensate. Hynds admitted further that the tax returns reflected an equal division of the partnership's losses, and that Askew had taken tax deductions of over $180,000. The partnership tax return was signed by both Riggan and Askew.

Following the trial, the trial court awarded Riggan a judgment against Askew. The trial court awarded $75,366, representing advances made to the partnership, and interest of $274,380, for a total judgment of $349,716. The trial court dismissed Askew's counterclaim for breach of fiduciary duty. Askew now appeals the trial court's decision in favor of Riggan.

On appeal, Askew raises seven issues:

1) Whether the application of the doctrine of judicial estoppel bars Plaintiff's cause of action;
2) Whether the trial court erred in awarding Plaintiff interest on the contributions made by plaintiff to the partnership;
3) Whether the trial court erred in treating plaintiff's contributions to the partnership as loans rather than capital contributions;
4) Whether the applicable statute of limitations barred plaintiff's cause of action;
5) Whether plaintiff's claim was barred by the equitable defense of laches;
6) Whether the trial court erred in failing to rule that the parties merged their previous partnership agreement into a new partnership agreement limiting defendant's liability to only his capital contributions to the partnership in consideration of defendant's pledging his interest in the partnership property as security for personal loans made to plaintiff; and
7) Whether the trial court erred in holding that the Partnership's 1989 federal income tax return did not constitute a settled account between the partners.

Our review in this case is *de novo* on the record of the trial court, with a presumption of the correctness of its factual findings, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). No presumption of correctness attaches to the trial court's conclusions of law. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

Askew alleges first that the trial court erred in failing to hold that the doctrine of judicial estoppel precluded Riggan from asserting his claim. Askew bases this assertion on Riggan's bankruptcy petition, filed and signed under oath in March 1989. The bankruptcy petition included Schedule B-2, a statement of all property that the debtor owns at the time the petition is filed. In preparing the Schedule, Riggan was requested to provide information on his assets, including:

P. Other liquidated debts owing debtor
Q. Contingent and unliquidated claims of every nature, including counter-claims of the debtor [give estimated value of each]
U. Interests in partnerships

3

The petition does not mention any claim against Askew under items P and Q. On cross examination at trial, Riggan admitted that by 1986 he had determined that Askew owed him money:

Q: [Y]ou say your agreement was for 50-50; is that correct, sir?
A: That's correct.
Q: And you say that you considered that [Askew] owed you some money.
A: I figured that at any time that you have a partnership and it is 50-50, every dollar that's put in it, whether I put it in or Mr. Askew put it in, the other partner is liable and obligated for the other part plus any interest that may be accrued.
Q: So you considered that Mr. Askew owed you money?
A: At what point?
Q: Did you in 1989?
A: Yes.

\*\*\*\*\*\*

Q: Did Mr. Askew owe you money in 1986?
A: Mr. Askew owed money almost from the inception of this project -- until now.
Q: Did he owe you money in 1986?
A: Yes.

Riggan explained his failure to list Askew's debt as follows:

A: I gave all the information to the attorney and they filled all this out. He told me to spell out everything, lay it out on the table. I had nobody question anything about this statement [the bankruptcy petition]. I had people that were trying to collect, and I spent a lot of money and a lot of time in court, but to no avail to them because we were up front with him and -- to start with. So as far as all the detailed reports on this thing, sir, I don't want to say that I put it all in there.
Q: Did you tell him [the bankruptcy attorney] that Turner Askew owed you over a half million dollars or whatever your contention is?
A: We got it listed right there 700 some odd thousand dollars.

Riggan then referred to an entry in the bankruptcy petition listed as "Interests in partnerships" which referenced a $550,000 interest in AR & Associates:

Q: The next page you're referring to shows AR & Associates, $550,000, statement of all property of debtor, right? Does that mean -- what does that mean?
A: Well, I imagine what that means, sir, is that $550,000 is what Mr. Askew owes me.

Under the doctrine of judicial estoppel, a party is bound by sworn statements made in former judicial proceedings. **Allen v. Neal**, 396 S.W.2d 344 (Tenn. 1965); **see also Sartain v. Dixie Coal & Iron Co.**, 150 Tenn. 633, 266 S.W. 313 (Tenn. 1924). In **Melton v. Anderson**, 222 S.W.2d 666, 669 (Tenn. App. 1948), this Court discussed the reasoning behind the doctrine:

A general statement of the doctrine of judicial estoppel is that where one states on oath in former litigation, either in a pleading or in a deposition or on oral testimony, a given fact as true, he will not be permitted to deny that fact in subsequent litigation, although the parties may not be the same.

\*\*\*

The doctrine in no sense depends upon prejudice to the party invoking it. Upon the contrary it rests solely on public policy which exalts the sanctity of the oath. The object is to safeguard the administration of justice by placing a restraint

upon the tendency to reckless and false swearing and thereby preserve the public confidence in the purity and efficiency of judicial proceedings. (Citations omitted).

In *D. M. Rose & Co. v. Snyder*, 206 S.W.2d 897, 906 (Tenn. 1947), the Tennessee Supreme Court discussed the requisite state of mind for application of the doctrine:

> While judicial estoppel applies where there is no explanation of the previous contradictory sworn statement, it does not apply where there is an explanation showing such statement was inadvertent, inconsiderate, mistaken, or anything short of a "willfully false" statement of fact. (citations omitted).

Therefore, the doctrine of judicial estoppel applies only if Riggan realized that he had a claim against Askew at the time his bankruptcy petition was filed, and nevertheless willfully omitted it. At the trial, Riggan testified that, during the course of the partnership, he repeatedly informed Askew that cash deposits placed into the partnership were loans to the partnership, for which Askew would be held liable. In addition, at the time the bankruptcy petition was filed in March 1989, the partnership had neither liquidated the Mills property nor rendered a final accounting quantifying the partners' respective financial status. The sale of the Mills property occurred in November 1989, and the partnership's tax returns were prepared and signed by both parties in April 1990. Whether Askew remained liable to Riggan primarily depended upon the sales price of the partnership's main asset -- the Mills property. This sale had not occurred when the bankruptcy petition was filed. Moreover, Riggan's failure to directly list a claim against Askew on the bankruptcy petition is mitigated by mention on the same document of an interest in the partnership, valued at $550,000. Consequently, the evidence does not preponderate against the trial court's determination that Askew failed to prove that Riggan's omission of a claim against Askew on the bankruptcy petition constituted a "willfully false" statement designed to mislead the court. The trial court is affirmed on this issue.

Askew asserts next that the trial court erred in awarding Riggan interest on his advances to the partnership, citing Tennessee Code Annotated § 61-1-117. Although Askew alleges in his reply brief that this issue was sufficiently raised before the trial court, his quote to the record consists of one sentence in which his attorney questions *what interest rate should apply to the debt*, not whether or not interest should be awarded. We are unable to find in the record a challenge by Askew to Riggan's entitlement to interest on the debt. Rule 6 of the Rules of the Court of Appeals requires that the appellant's brief contain a written citation to the part of the record containing appellant's

5

challenge of the alleged error before the trial court:

> **Rule 6.   Briefs --** (a) Written argument in regard to each issue on appeal shall contain:
> 2.   A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.
> (b) No *complaint of or reliance upon action by the trial court will be considered on appeal unless the argument thereon contains a specific reference to the page or pages of the record where such action is recorded.*   No assertion of fact will be considered on appeal unless the argument upon such assertion contains a reference to the page or pages of the record where evidence of such fact is recorded (Emphasis added).

In the case at bar, Askew's brief on appeal does not contain any reference to the portion of the record in which Askew raised to the trial court his opposition to an award of interest to Riggan on his contributions to the partnership.  Since Askew points to no place in the record which reflects that this argument was made to the trial court, it shall not be considered on appeal.

Askew also contends that the trial court erred in treating the advances made by Riggan to the partnership as loans rather than capital contributions.  Askew contends that the determination of whether the advances were loans or capital contributions affects the interest awarded upon dissolution.  As noted above, Askew pointed to no place in the record in which he opposed an award of interest on Riggan's contributions to the partnership; therefore, this issue will not be considered on appeal.  To the extent that the trial court's treatment of these monies as loans rather than capital contributions affects any other issue, the evidence in the record does not preponderate against the trial court's decision.  Neither Askew nor Riggan introduced evidence, other than partnership tax returns, to support their respective claims concerning Riggan's advances.  The proof consisted of Riggan's testimony that Askew promised to repay the contributions and Askew's denial of such statements, a credibility determination for the trial court to determine.   The trial court's determination regarding credibility is accorded great weight by the appellate court. *See Doe v. Coffee Co. Bd. of Ed.*, 925 S.W.2d 534 (Tenn. App. 1996).  The decision of the trial court is affirmed on this issue.

Askew further asserts that Riggan's cause of action for reimbursement of "advances" to the partnership plus interest is barred by the six year statute of limitations governing actions based on contracts, Tennessee Code Annotated § 28-3-109(a)(3), or, alternatively, by the ten year statute of limitations governing actions on demand notes as set forth at Tennessee Code Annotated § 28-3-109(c). He points to Riggan's claims that the amounts advanced were debts of the partnership, and

6

states that if that were true, then the amounts became immediately due and payable. Because the cause of action accrued when each advance was made, Askew argues that the statute of limitations for actions based on a contract runs from that point in time, and therefore bars the suit for reimbursement.

Because there was no explicit agreement concerning repayment of the funds, the rules set forth in the Uniform Partnership Act govern. *See Young v. Cooper*, 30 Tenn. App. 55, 203 S.W.2d 376 (1947). Partners who made payments and incurred reasonable personal liabilities on behalf of the partnership are entitled to indemnification by the partnership. Tenn. Code Ann. § 61-1-117(2) (1989 and Supp. 1996). A partner who seeks to recover advancements must first request an accounting in equity. *See Mandrell v. McBee*, 892 S.W.2d 842, 847 (Tenn. App. 1994); *Snow v. Adamson*, 385 S.W.2d 759, 761 (Tenn. 1965); *Davis v. Fisher*, 27 Tenn. App. 663, 184 S.W.2d 400 (1944). In an action for accounting under the Uniform Partnership Act, the statute of limitations begins to run at the time the partnership is dissolved. Tenn. Code Ann. § 61-1-142 (1989). Under Tennessee statutes, the partnership between Askew and Riggan dissolved when Riggan filed bankruptcy in March, 1989. *See* Tenn. Code Ann. § 61-1-130(5) (1989 and Supp. 1996). Although the advancements made by Riggan were immediately due and payable *and* subject to interest, *see* Tennessee Code Annotated § 61-1-117(3) (1989 and Supp. 1996), the claim did not accrue until the dissolution of the partnership. *See Manley v. Belew*, 190 Tenn. 698, 231 S.W.2d 353 (1950). Riggan filed this lawsuit seeking an accounting in December 1992, within the applicable six year limitation period. Accordingly, the decision of the trial court is affirmed on this issue.

Askew also asserts on appeal that Riggan's cause of action is barred by the equitable doctrine of laches. Laches is a defense peculiar to the courts of equity and will generally be applied when no statute of limitations governs. *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. App. 1990). On occasion the doctrine is applied prior to expiration of the statutory period where the plaintiff has been guilty of gross laches in the prosecution of a claim. *Id*. A summary of the doctrine of laches is in *11 Tenn. Jurisprudence, Equity, §39*:

> The two essential elements of laches are negligence and unexcused delay of the complainant in asserting his alleged claim and injury to rights of third persons intervening during and therefore on account of the delay. Thus, the determinative test as to laches, which may be available as a successful defense in an equitable action, is not the length of time that has elapsed, but whether the party relying on laches as a defense has been prejudiced by the delay.

7

Askew contends that Riggan's delay in filing suit resulted in over $250,000 in interest accruing on a $75,000 outstanding loan balance over an 18 year period. Askew also notes that Riggan lost many of the partnership's tax and financial records. Askew, however, fails to explain how the loss of the records prejudiced his defense. Riggan's expert witness, Robert Hester C.P.A., testified that the partnership documents contained all the information necessary to provide an accurate accounting of the partnership's finances.

Askew also contends that Riggan lost documents which described how the proceeds from the personal loans that Riggan received were used. However, Askew fails to explain how Riggan's use of the loan proceeds is relevant to the case at bar. These loan documents were unnecessary to perform the partnership accounting. Therefore, other than the accrual of interest on the indebtedness, Askew failed to present evidence demonstrating that he was prejudiced by Riggan's delay in filing suit. The evidence does not preponderate against the trial court's finding that the doctrine of laches is not applicable in this case. The trial court is affirmed on this issue.

Askew next contends that the trial court erred in failing to hold that the parties' original partnership agreement had evolved into a new agreement in which Askew's liability was limited to his interest in the partnership property. Askew contends that his limited liability resulted from pledging his interest in the partnership's property as security for personal loans made to Riggan. However, Askew's testimony on this issue does not establish a specific "new" partnership agreement:

> Q: What agreement was reached with Mr. Riggan at the time that you limited your liability to the investment that you had in the realty?
> A: You know, I can't honestly answer that. I never took personal liability after that other than the agreement with my mother, and that was a pre-existing agreement but my -- I think that was the extent of my liability. I mean --
> ******
> Q: Did you ever have a specific agreement with Mr. Riggan that your liability was only the land?
> A: We never had a specific agreement period. That's the problem.
> *****
> Q: Is your testimony, then, that you really had no specific agreement on anything? Is that really where you are? Is that your testimony?
> A: Unfortunately, that is my testimony, and that is my honest belief. I mean, we hoped to make a profit, and that's not much of an agreement.

In addition, James Hynds, Askew's personal accountant and the partnership's accountant, testified that **all** of the partnership's tax returns reflected an agreement under which profits and liabilities were equally split between the partners. The evidence does not preponderate against the trial court's holding, and the decision of the trial court is affirmed on this issue.

Finally, Askew maintains on appeal that the partnership's signed tax return for 1989 constituted a settled account between the parties, thereby precluding Riggan from bringing suit. In Tennessee, a settled account is an account which is admittedly correct. So long as the account is disputed, it cannot be a liquidated or settled account. ***Mack v. Hugger Bros. Constr. Co.***, 10 Tenn. App. 402 (1929).

In this case, it is undisputed that Riggan signed the partnership's finalized tax documents in April 1990. Both parties agreed that the 1989 tax form indicated the final tax position of the partners at the dissolution of the partnership. Neither party disputes that the $75,000 figure is correct. Rather, the parties dispute Askew's liability to Riggan for payment of Riggan's $75,000 loss. Riggan testified that after the dissolution of the partnership and the sale of the Mills property, Askew assured him that he would repay the outstanding debt when he obtained sufficient funds. Askew denied ever agreeing to repay Riggan any outstanding loan balance. The 1989 tax form does not clearly absolve Askew from liability to Riggan; rather, it is a formal accounting, necessary for dissolution of the partnership. Determination of whether Askew agreed to pay Riggan the outstanding debt required the trial court to assess Riggan's and Askew's credibility. The weight, faith and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility determination of the trial court is accorded great weight by the appellate court. ***See Doe v. Coffee Co. Bd. of Ed.***, 925 S.W.2d 534 (Tenn. App. 1996); ***Koch v. Koch***, 874 S.W.2d 571 (Tenn. App. 1993). We find that the trial court did not err in declining to hold that the 1989 tax form constituted a settled account between the parties as to the payment or repudiation of the debt.

In sum, we affirm the trial court's holding that Riggan is not judicially estopped from asserting his claim against Askew because the proof does not clearly show that Riggan willfully omitted his claim against Askew from his bankruptcy petition. We also affirm the trial court's award of interest, because Askew cites no place in the record in which this issue was raised to the trial court. The trial court's treatment of Riggan's advances to the partnership as loans rather than capital contributions is affirmed based on the credibility determination of the trial court. We affirm the trial

9

court's holding that Riggan's claim is not barred by the statute of limitations because the statute began to run when the partnership was dissolved. The doctrine of laches is not applicable because Askew failed to show he was prejudiced by the delay, beyond the accrual of interest. We affirm the trial court's holding that Askew's liability was not limited to his interest in the partnership property because Askew failed to present sufficient proof to establish such an agreement. The trial court's holding that this was not a settled account is affirmed based on the trial court's determination of Riggan's and Askew's relative credibility. Therefore, the decision of the trial court awarding damages plus interest to Riggan is affirmed.

Costs on appeal are taxed to the Appellant, for which execution may issue if necessary.


_____
**HOLLY KIRBY LILLARD, J.**


**CONCUR:**


_____
**ALAN E. HIGHERS, J.**


_____
**DAVID R. FARMER, J.**