IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 6, 2003 Session

## AMY HOLLOWAY BUTLER (MOSCHEO) v.
## MICHAEL CLIFTON BUTLER

**Appeal from the Circuit Court for Davidson County**
**No. 93D-3551    Muriel Robinson, Judge**

_____

**No. M2002-00347-COA-R3-CV  - Filed February 20, 2003**

_____

The mother of a minor child, as custodial parent, appeals the action of the trial court in denying her application to relocate with the child from the Nashville area to the Dallas-Ft. Worth, Texas area pursuant to Tennessee Code Annotated section 36-6-108(d). We affirm the action of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S. and STELLA HARGROVE, SP. J., joined.

Philip E. Smith, Nashville, Tennessee, for the appellant, Amy Holloway Butler (Moscheo).

R. Eddie Davidson, Nashville, Tennessee, for the appellee, Michael Clifton Butler.

**OPINION**

Amy Holloway Butler (Moscheo), hereinafter "Mother," and Michael Clifton Butler, hereinafter "Father," are natural parents of the minor child, B. Butler. They were divorced by decree of the Circuit Court of Davidson County on February 14, 1994. Mother was awarded custody of the minor child, with Father having visitation on the first and third weekend of each month, on alternating major holidays, for half of the Christmas break, and for six weeks in the summer. Mother is employed by American Airlines, which provides flight service in and out of Metropolitan Nashville but has its primary hub in Dallas-Ft. Worth, Texas.

On August 17, 2000, Mother filed her Petition to Relocate with the minor child to the Dallas-Ft. Worth area, asserting that she had an opportunity for much better employment in Dallas-Ft. Worth with a considerably higher salary and an opportunity for advancement. On September 6, 2000, the Father filed his response and objections to removal of the minor child from Nashville to Dallas-Ft. Worth. The case came on for trial on November 27, 2001. At the conclusion of the hearing, the trial court held:

The Court finds based on a statement of counsel, the testimony of the parties and witnesses and the record as a whole, that the Mother's request to move is based on her desire to advance her career. The Court further finds that the desire of the Mother to advance her career is a reasonable desire. The Court further finds that the Father has exercised the visitation as set forth in prior court orders and that he has developed a close relationship with the child. The Court further finds that Texas does not have good reciprocity with the state of Tennessee and that there is a risk that the Father would not have access to the child. Further, the Court feels that it will loose jurisdiction over the minor child. The Court further finds that it is in the best interest of the minor child to remain in the Middle Tennessee area. The Court further finds that the Mother shall be allowed to move but the minor child's residence shall remain here.

Tennessee Code Annotated section 36-6-108(d) provides:

The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court pursuant to a change of custody or primary custodial responsibility. The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:

(1)     The relocation does not have a reasonable purpose;
(2)     The relocation would pose a threat of specific and serious harm to the child which outweighs the threat of harm to the child of a change of custody; or
(3)     The parent's motive for relocation with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

Tenn. Code Ann. § 36-6-108(d)(1-3)(2001). The decisive issue in this case is whether or not the custodial parent has established a reasonable purpose for relocation.

Doubtless, relocation because of a better job opportunity, greater salary, and career advancement opportunities, establishes a "reasonable purpose" within the meaning of the statute. The proof offered in this case, however, does not sustain the allegations of such increased salary and increased opportunities.

The proof establishes that both Mother and Father are good and attentive parents and that Father faithfully exercises his visitation rights with his daughter. The daughter is well settled in the Davidson County area with adequate schooling facilities. However, such considerations are inadequate under the statute to prevent a custodial parent from relocating if a reasonable purpose is established. The difficulty is that, while Mother discusses in her testimony a job in Ft. Worth and career advancement opportunities, when the record as a whole is considered, she presents to the court no job offer but, rather, a litany of things that she hopes to be able to accomplish after such a move. She testified:

Q.      Now what are you making annually right now?

A.      Twenty-four thousand a year.

Q.      And if you were allowed to pick up more flying time as a flight attendant living in the Dallas, Ft. Worth area what would your salary jump to then?

A.      It has the ability to go as high as $80,000.

Q.      Okay.  Now let me ask you this, have you been offered a job within American Airlines that is not a flying job?

A.      Yes, I have.

Q.      And what does that job entail?

A.      It is an instructor for recurrent training at the flight academy in Dallas.

Q.      And what would be the opportunity for you to start out, salary wise, at that job?

A.      The opportunity would be $43,000 a year.

Q.      Have you ever made $43,000 in any year?

A.      No, sir.

On cross-examination, however, Mrs. Muscheo testified:

Q.      Now today I believe you told the Court that if you move to Dallas, you could be earning as much as $80,000 per year?

A.      No.  If I flew high time every single day of the month, which is impossible, and I had been with American for five or six years, the pay scale changes for each - - after five years it changes.  Of course, it is all union but I would have the opportunity to fly more if I lived in Dallas.

Q.      Well, I wrote down $80,000 a year.  Is it your testimony that you could make up to $80,000, or is that not correct?

A.      I'm sure that I probably could, but that is if I didn't have three children and a life.

Q.      And you also told the Court that if you took a job as an instructor, you could start at $43,000 per year, correct?

A.      I have that ability.

Q.      Right.  And in the deposition I asked you that, just about a month ago, and do you remember the figure that you gave me then?

A.      No, sir, because at the time I wasn't 100 percent sure.  Since that time, I have gone to American and my boss and found out exactly what that starting pay would be.

Q.      Let me ask it this way.  Do you remember telling me in your deposition or I asked you how much that would be for the EPT Instructor, and you said $34,000  a year.  Do you remember telling me that figure?

A.      Because in my mind and on that day, I really did truly think it was about $37,000.

Q.      And do you remember me asking you - -

THE COURT: What actually is it, what is your starting pay at this new position?

THE WITNESS: They have offered me $43,000.

MR. DAVIDSON: Your Honor, I will object to that, that would be a hearsay-type offer and I will object to that.

THE COURT: Well, I want her to answer my question. What is your starting pay, $43,000?

THE WITNESS: No, it tops out at $43,000.

THE COURT: I'm not asking you what it tops out, I'm asking you what is your starting pay?

THE WITNESS: There again, my boss offered me $43,000.

THE COURT: You are not going to answer the question?

THE WITNESS: I'm sorry, I'm getting a little nervous.

THE COURT: The question is or what you are telling me is, in a round and about way, if you take this job you are not automatically going to get $43,000. What is the rate of pay if you take this job tomorrow? What is your starting salary?

THE WITNESS: My starting salary would be $37,000 with the opportunity to max out - -

THE COURT: I think I understand what you mean.

THE WITNESS: Okay. I'm sorry.

QUESTIONS BY MR. DAVIDSON:

Q.      Now in your deposition you mentioned two or three people that could testify as to what you would be making, a Sharon Lentz and Patrick Walsh and a Kris Vanible. Do you remember talking about those people?

A.      Yes, I remember you asked me, I believe, who my bosses were or who I reported to.

Q.      Right. And I asked you if you were going to be bringing them to Court, and do you remember your answer?

A.      If necessary, yes, we would.

Q.      Now are they here today to testify?

A.      No, they are not here to testify.

Q.      Now do you remember - -

A.      But they did send letters.

. . . .

Q.      And, in fact, if you took all of these other flights and worked a lot more and were flying in the air considerably more then you would be spending less time with your children, correct?

A.      That is why I want to be an instructor. That is why I want to move there so that I can work there and work from 8:00 to 3:00 when my children are in

school. I am not trying to be difficult, I'm truly just trying to advance in my career and make something of myself.

Q. But as far as proof that you would have this instructor's job, you have nothing here today other than you are telling the Court that it is or was available to you, correct?

A. Yes, that is exactly what I'm telling you and that is what the letters state that they sent.

Q. Now - -

A. That is why they are not here because I told them that the letter would be fine.

Faced with a seemingly insurmountable evidentiary problem, the trial court thereafter observed:

THE COURT: She doesn't have any proof as to the offer. She said that she thought the letter would do it, but evidently she didn't consult with her attorney because you have objected to it as being hearsay so move on to something else. She doesn't have an offer today, she only thinks that they may make her the offer if she moves there.

This case is unlike *Caudill v. Foley*, 21 S.W.3d 203 (Tenn. Ct. App. 1999), where justification for relocation was based upon a new husband with a successful business in Freeport, Florida, together with the facts that the child had many friends and relatives in the Freeport area and that the former Mrs. Foley thought she had an excellent chance of re-employment with her former employer in Freeport. Mother offers no proof of anything in Texas except a belief and a hope that she can secure better employment. There is no proof in the record that B. has any friends or acquaintances in the Dallas-Ft. Worth area. It is also correct to say that nothing in the record indicates that the move to Texas would pose a threat of specific and serious harm to B., nor is there any proof that such move on the part of Mother is motivated by vindictiveness.

The fundamental problem is the lack of proof concerning any job in Texas. Mother identified three people, Sharon Lentz, Patrick Walsh, and Kris Vanible, in deposition as persons who could testify about her future employment in Texas. On her witness list, she listed Patrick Walsh and a "representative from American Airlines" but chose not to call them as witnesses. Instead, she relied on alleged letters, which were promptly and properly objected to by Father's attorney.

The standard of review in this case under Tennessee Rule of Appellate Procedure 13(d) is *de novo* upon the record with a presumption of correctness of the trial court's factual determinations unless the evidence preponderates against those determinations. *Jahn v. Jahn*, 932 S.W.2d 939 (Tenn. Ct. App. 1996). No presumption of correctness attaches to the trial court's conclusions of law under this rule. *Tennessee Farmers Mut. Ins. Co. v. Moore*, 958 S.W.2d 759 (Tenn. Ct. App. 1997). The credibility of witnesses and the weight to be given their testimony lies, in the first instance, with the trier of fact, who has had the opportunity to observe the manner and the demeanor

of the witnesses as they testify. Credibility determinations by the trial court are accorded great weight by an appellate court. *Koch v. Koch*, 874 S.W.2d 571 (Tenn. Ct. App. 1993); *Doe A. v. Coffee County Bd. of Educ.*, 925 S.W.2d 534 (Tenn. Ct. App. 1996).

The assertion by the trial court that "Texas really doesn't have good reciprocity with Tennessee" is not supported by any evidence in the record and is not a proper subject of judicial notice. Tenn. R. Evid. 201(b).

The Court has considered the applications of both parties for attorney's fees and, in its discretion under Tennessee Code Annotated section 36-5-103(c), declines to award attorney's fees to either party.

The judgment of the trial court is affirmed on the basis that the proposed relocation does not have a reasonable purpose. The case is remanded to the trial court, and costs of the cause are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE